Thank you, Your Honor, and good morning. My name is Tom Waldo. I'm the attorney for the Plaintiffs and Appellants in this case, and with me at the counsel table is my co-counsel, Neil Lawrence, with the Natural Resources Defense Council. In my argument today, I'd like to address three things. First, the relevance of the Forest Service's error in interpreting its own market demand projections for the Tongass plan. Second, the effect of the 2003 Wilderness decision. And third, the disproportionate high grading of the best quality old growth in the Tongass. I don't want to put you off course, but could you do number two first? Because it seems to me that I need to understand the grounding of where your appeal emanates from, and that the effect of the 2003 SEIS is unclear to me, and I would appreciate knowing that as we kind of hear the rest of the argument. Well, the effect of the 2003 EIS on this case is none at all. It is an EIS that focused exclusively on the narrow question of formal wilderness designation as required by a court order. Wilderness is a permanent, highly protective designation that only Congress can make, so the agency's role is limited to making recommendations to Congress. The wilderness evaluation was just one small piece of the forest planning puzzle that the Forest Service had neglected in the original planning process. And the Forest Service stated over and over again throughout that supplemental EIS process that the only purpose of this process was to fill in this one missing piece of the puzzle. So your challenge is to the 1997 ROD? That's correct. Our challenge is to the 1997 Record of Decision and the EIS that goes with it. The wilderness supplemental EIS specifically states many times that it is not a realistic reanalysis of wildlife conservation strategies. It is not a reanalysis of the whole plan or any other issue other than possible wilderness recommendations. It did not re-adopt or supersede the 1997 decision. What was the third issue you were going to mention? High grading? After considering in the wilderness EIS alternatives for recommending new wilderness areas, the Forest Service simply took no action, adopted the no action alternative and left the current plan in place. The argument that the wilderness decision somehow re-adopted the 1997 plan is a post hoc attempt to redefine that wilderness process. One of the nice things about electronic records like we have in this case is that you can do full text searching. We searched the entire wilderness Record of Decision, the final supplemental EIS and the draft supplemental EIS and none of them ever used the words re-adopt or re-issue or supersede or any variations of those words that the Forest Service is now using to describe their action. The re-adoption theory is an argument that Justice Department made up after the process was complete. Can I ask you with respect to this electronic searching, did you run a similar search on these timber projections and show everywhere that they appear in the record? Not with respect to the 2003 SEIS but with respect to the 1997 decision and the record? We did a lot of electronic searching of that certainly. Well I guess my question is, is there anywhere in the excerpts that we can determine everywhere those timber projections were referenced? Has that been compiled for us? I think that the excerpts of record is quite thorough in disclosing those parts of the record where the Forest Service cited to the Brooks and Hames Market Demand Projection and based its decision on them. So why don't I turn to that. The Forest Service argues that this mistake, the Market Demand Mistake, was harmless error. Have they conceived a mistake? I'm sorry? They concede the mistake. They certainly do. So it's just a question of? It's whether it's harmless error. They say that it was irrelevant to anything in the decision or in the EIS. That is a difficult burden for the agency. When an agency claims harmless error in this kind of non-formal decision making, the burden shifts to the agency to show that its mistake clearly had no bearing on either the procedure used, which was an EIS in this case, or on the substance of the decision. The Forest Service cannot meet that burden here. The facts show that the mistake clearly did have a bearing on both the EIS and the final decision. Let me start with the final decision. The record of decision explicitly cites and discusses the Brooks and Haynes Market Demand Report twice under the heading of Rationale for Decision. The decision cites the report as a factor in determining how much timber was needed to ensure a flexible timber sale program and then cites the report again to show that the decision allows enough timber to meet the medium but not the high market demand projections. That, of course, was wrong. The decision authorized way more than enough timber to meet all of the projections. The Forest Service argues in its brief that the agency was just trying to maximize options and preserve as much flexibility as it could with its timber sale program. But that is not what the regional forester said in the record of decision. Of course, he was trying to preserve a certain degree of flexibility in the timber sale program, but he had to balance that interest against the harm it would cause to many other resources. And he explicitly used the Market Demand Report to help figure out the tradeoff between these competing interests. Another thing he described as an important... Let me just clarify on that. Did he expressly balance the demand, the need to satisfy timber demand with risks to wildlife from the logging activities? Well, yes. He addresses risk to wildlife in the same couple of pages. There's these two critical pages at pages 15 to 16, I think, of the record of decision, or maybe it's 14 to 15, where he's balancing all these factors. He's talking about risk to wildlife. He's talking about market demand. He's talking about the need for a flexible timber sale program. He says in that discussion that some of the alternatives would have more timber than is needed for a flexible timber sale program. Others would have not enough. And that the amount of risk that this caused to wildlife was acceptable. So he clearly was... What you see when you read this record of decision and the EIS is that the regional forester was responding to directly conflicting interests and obligations. On the one hand, the economists were telling him that he needed to supply a certain amount of timber in order to meet market demand and to provide the corresponding economic benefits. On the other hand, the wildlife biologists were telling him that he needed to set aside more of the unfragmented forest into reserves in order to ensure well-distributed, viable populations of wildlife. It was impossible to provide the volume of timber he thought was needed to meet market demand while also avoiding risks to wildlife. He had to make tradeoffs. He had to make choices about relative risks. And the problem is he fundamentally misunderstood the timber side of the equation. And that affected his result. Some of the other ways you can see this in his decision, he described as an important factor in his decision the economic impacts. And in doing so, he specifically cited to the socioeconomic analysis in the EIS. But that analysis suffered from the same mistake. In the EIS, the market demand error caused the forest service to double the numbers for logging levels, jobs, earnings, and business income throughout the socioeconomic analysis. So the flawed economic analysis not only affected his substantive decision, but it also infected the process by misleading the public as to the likely economic effects of the decision and the comparison of the alternatives. There's one more way that the record shows the market demand error had an effect on the substance. And it's his risk analysis on the wildlife. The agency adopted a plan that causes substantial risk to wildlife, but they found the risk acceptable. The only discernible justification for that in the record, for accepting this risk, for finding it acceptable, is the market demand for timber and the corresponding economic benefits, both of which were mistakenly doubled. Under the viability regulation and under this Court's decision in Seattle Audubon Society v. Mosley, there has to be some compelling multiple-use reason to justify a substantial risk to wildlife viability. Without the market demand or economic benefits of logging, there's no justification here. And that puts the forest service on the horns of a dilemma. If market demand was a relevant factor in the regional forester's decision, then the decision would still be arbitrary. But if market demand was not a relevant factor, then there was no justification for the risk that the plan caused to wildlife, and the decision would still be arbitrary. Also, if he ignored market demand in the plan decision, then there is no place in the record where, in which the agency considered market demand over the planning cycle as The forest service argument, there's a certain passing in the night in terms of analysis of the forest plan, the Tongass statute, and the 2003 SEIS. And they're suggesting that your interpretation of how the forest planning works is not 100 percent on target. So I would like more explanation of how you think the forest plan interacts or interfaces with the statute, the Tongass statute that sets out looking at market demand. Do you know which statute I'm referring to? The Tongass Timber Reform Act, yes, seek to meet market demand. That's correct. So the question is how the decision relates to the Tongass Timber Reform Act? Yes. Well, you have the plan and the reform act and how the two interrelate. Oh, sure. Okay. The Tongass Timber Reform Act has two separately enumerated subdivisions. It says subject to applicable laws and seek and multiple use and sustained yield and all those things, seek to meet market demand, one, annually, and two, over the planning cycle. Over the planning cycle has always been understood to mean the 10 to 15 year duration of a forest plan. The National Forest Management Act requires a plan to be revised every 15 years at a minimum. And it was addressed that way throughout this process. There were sections in each one of the draft and final EISs on market demand. They talked about it being the 10 to 15 year planning cycle. They asked the Pacific Northwest Research Station to prepare these market demand reports. That was the Brooks and Haynes report that was the subject of the error. And they used it to calculate jobs and income and all these other factors. They used it as reasons to refuse to consider various alternatives that were suggested by the public. It was clearly an integral part of the planning process. And that's the subdivision two of the TTRA, over the planning cycle. There's a separate requirement that they seek to meet market demand annually. In order to meet that requirement, they had their regional economist named Kathleen Morse prepare a kind of formula that they run every year to try to figure out how much to offer on a year-to-year basis in order to make sure that they're meeting market demand. They're two entirely separate processes. They interrelate with each other. The Forest Service made an argument that the Forest Service only seek to meet it over the planning cycle. But that interpretation just eviscerates the whole planning cycle provision of the Timber Reform Act. That provision was in there to make sure that they addressed it as a separate matter. Otherwise, it's just redundant surplusage. Let me go back to the standard. There's an assumption on your part that Gifford, Pinchot and the Harmless Error just transfers to this context. And normally we would be looking at this on an arbitrary and capricious standard. Do you think that the Harmless Error's burden is at the inverse of this arbitrary and capricious? And how do they relate? And can you think of another case that's in this context of a NEPA or NMFA challenge in which the Harmless Error is the standard? I'm not aware of a NEPA or NIMFA case that does that. The way I think that they interact is we have shown a prima facie arbitrary decision in that their own decision includes a mistake in the way that they read this report. And that establishes the arbitrariness that then shifts the burden to them to show that that mistake actually had no role in the decision. It clearly had no bearing. There have been cases that you might be referring to where this Court has put that burden on plaintiffs to show that they are not responsible for their own decisions. So what would happen in those cases, the facts were that an agency had a deadline to meet and it missed that deadline but took the action that was required belatedly anyway. And so it's just simply a delay. And in those cases the courts have said, well, the plaintiff should show why the plaintiff is prejudiced when it's just a delay and there's no apparent reason why that would harm them. But I think that's very different from this kind of case which, like other non-formal agency decision-making cases, ought to fall under Gifford-Pinchot. Counsel, I'd like you to address what you consider the impacts of the high grading. Well, the high volume old growth has the greatest value for wildlife and for timber production. Because of their value for timber, past logging has focused overwhelmingly on these stands. Throughout the planning process, the Forest Service assumed that future logging under the plan would occur proportionately, with the high volume logged in proportion to the lower volume stands. This was due in large part to a requirement to that effect in the 1990 Timber Reform Act. But just within months before the plan was finalized, the last of the contracts that that Timber Reform Act provision applied to was canceled. And the proportionality requirement didn't apply anymore. As a result, the Forest Service, at the last minute, removed this limitation and proceeded to implement the plan in a way that disproportionately targets those particularly valuable high volume stands. The problem is that all of the analysis of the impacts to wildlife and other resources in the EIS is still based on the assumption of proportionate logging in the future. The Forest Service argues that the EIS provides an informative discussion of high volume old growth. That's their words in their brief. The agency's brief goes on for several pages with citations to various pages in the EIS, some of which discuss high volume logging, but none of those parts of the EIS assess the impacts of future disproportionate logging of high volume stands. None of them. And to take just one important example, the biologists who reviewed the risks to the viability of various species based their analysis in part on the assumption of proportional logging. So when that change was made at the last minute, the EIS no longer fully portrayed the impacts of the plan and the decision was based on assumptions and analysis that were no longer true. If I may, I'd like to reserve the remainder of my time for rebuttal. I'm going to give you some rebuttal time, but I have one more question for you. There's another area where you and the Forest Service are really using different benchmarks. You're looking at the Morse or these projections that were done and that have now been admitted to be in error, at least the doubling or however of them. They're saying that they're not really using market demand as a foundation, but the notion of sustained yield, which of course comes from a different place, and the earliest figures on that predate some of these projections. What is your response or explanation for this differing view? Well, it's hard to say because that whole discussion in the Forest Service brief about sustainability has no citations. It's very hard to follow. But certainly the Forest Service is of course required to comply with sustained yield, but it just doesn't answer the question here. You can have high sustained yields of timber with low sustainable populations of wildlife, or you can have high sustainable populations of wildlife with low sustained yields of timber, but that doesn't answer the question of how to balance those things. That's why it's the Multiple Use Sustained Yield Act. You consider these different uses, you balance them, you try to find the mix that best meets the needs of the American people and complies with the law. That's the process that occurs. We've included the citations that explain that in our brief, which I think differs from the government's brief, which has this description of a process that's largely devoid of any citations. How does the allowable sale quantity figure in to the analysis in your view, the ASQ? Well, it's the maximum allowable that the Forest Service can cut. They determine that by looking at how much timber can be produced on a sustained yield basis within the land base that they've made available for logging. Here, that land base is 2.4 million acres of roadless areas, plus 1.5 million acres of already roaded areas. They ran that through their models and determined that it would produce an allowable sale quantity of 267 million four feet per year. That is a maximum, and they're not logging at that level. No. But the important thing about this case for us is it's not about the volume. It's about the lands that are open for logging. The problem is they've got all these roadless areas open for logging, and all of the timber sales that we challenged in this case are in those roadless areas. If they had correctly understood the market demand projections, an obvious alternative, it could have reduced the risk to wildlife and still provided plenty of timber for industry would have been to protect more of those roadless lands to preserve more unfragmented habitat. This was the fragmentation of habitat that was the main cause of the risk to wildlife. Thank you. Thank you. We'll hear from the Forest Service. Welcome back. May it please the Court. I'm Elizabeth Ann Peterson from the Justice Department on behalf of the Forest Service. With me at council table today is my co-counsel, Bruce Landon, and Steve Silver from the Alaska Forest Association, and Zach Falcon from the state of Alaska. I will be dividing my time with the interveners. We will use 15 minutes. Let me just ask you a question. In reading the order or the opinion of the district court, there was some ambiguity as to who was in and who was out. Was that all settled so these people are actual appropriate interveners? I believe so, Your Honor. The proceedings below were bifurcated, and as a consequence, the question about relief was the primary issue for which the interveners were admitted into the case. That remains an important issue to them on appeal, and we have given them some of our time because we agree that that's an important issue. There are a number of issues that I'd like to reach today with respect to the merits of this case. First, the Forest Service decision to adopt Alternative 11 as a forest plan was not affected by the update of market demand projections as asserted by the appellants in this case, and the Forest Service did not expose wildlife to risks in order to ensure that market demand could be met. That is simply not the way the plan was designed, and it was not the way the plan was adopted. Third, the plan revision did not mislead the public or the decision-maker with respect to economic impacts, and it did consider a full range of reasonable alternatives. Finally, the EIS for the plan fully disclosed past and likely future impacts on high-volume old-growth stands. First, I would like to address the question of reviewability. We do believe that the 2003 Appropriations Act bars review of the 2003 rod and the pipe for the Tongass, and that is the current decision applying the 1997 plan to management of the forest. The forest is managed under the plan because of the issuance of that plan. That decision, which was based on the entire record of both the 1997 and the 2003 NEPA work. Included in the 1997 NEPA work is Appendix M. Appendix M is addressed to whether a supplemental EIS is needed to address the new market conditions reflected in the updated projections that were received shortly before the 1997 record of decision was issued. In that appendix, the Forest Service correctly interpreted the updated projections, considered the potential for their impact to be significant enough that a supplemental environmental impact statement was warranted, and concluded that it was not because those conditions were met. That error, which the Forest Service has admitted making, was therefore reflected only in the 1997 decision to apply the 1997 plan to the forest, and not in the 2003 decision in which the correct figures along with the decision not to supplement the NEPA work were underlying documents. As a consequence, I believe we, it is our position that this is a challenge not to the 1997 ROD, but to the currently effective ROD, and that's the 2003 ROD, to which the subject, to which the legislation. But wasn't, it says in the summary and then it's throughout that the reason you had the roadless areas. That is absolutely correct. I have no argument with that and the, and the. But their challenge is broader to that. I mean, even if you're, you know, some percent correct that this includes something, their challenge is much broader in terms of the challenge to these sales, isn't it? That's correct, Your Honor. But what they need, this is an Administrative Procedure Act challenge. So they need to challenge a decision or an action. The action that they're challenging is the choice of this forest plan. They have challenged a lot of timber sales on grounds that they were only designed in these roadless areas where they are to take place because the Forest Service chose the wrong plan. And it is our position that we chose that plan in 2003 based on the full record. But they're also saying that the plan adopted in 1997 is arbitrary and capricious because the Forest Service, weighing multiple uses as it must under the statute, balanced an inflated demand figure against the other considerations that it took into account. It is saying that. And let me address that, too, Your Honor. It seems like that's not negated, at least in my mind. That's not answered by a 2003 supplemental EIS that looks at the roadless areas. That's correct. The EIS is irrelevant to the new decision. The new decision is based on all of the many EISs and Appendix M, which concluded that a supplement was not needed to address the misinterpretation of those market demand projections. It's because the market demand projections were of no significance to the choice among alternatives. And that, Your Honor, is because the Forest Service does not balance market demand against other risks, other protective measures in forest planning. It is absolutely abundantly clear on this record that what the Forest Service did in determining what timber would be permitted to be cut was to go over and over the forest to determine what lands needed to be excluded from any consideration of any logging in order to ensure for the next 100 years at the maximum level of production that the species on the forest would remain viable. But isn't the Forest Service's decision about how much logging it's going to authorize, isn't that affected by its assessment of demand? No, Your Honor, it is not. Isn't it required by the TTRA to take demand into account? No, Your Honor, it is not. No, the TTRA, first and foremost, requires compliance with all of the requirements of the environmental statutes before any obligation to seek... What does it say about demand? It says that after complying with all of the other statutes, the Forest Service shall seek to provide a supply of timber that will meet local market demand. What that means is that the Forest Service is expected over the long term to supply timber if timber can be supplied, consistent with the other obligations of the environmental statutes. And the other obligations, though, at least in the way I've understood them, permit the Forest Service to balance these various considerations that are in its broad chart? That's correct, Your Honor. But one of those values that needs to be considered is the viability of all resources on the forest. And so before any decision can be made about which lands can be effectively used for timber production, the Forest Service has to determine which lands need to be preserved to ensure the long term, and that is over the planning horizon of 100 years, all of the resources on the forest. And that was driven, in this case, by wildlife considerations. The Forest Service considered what habitat needs the various species on the forest required and set aside a mosaic of reserves connected by corridors such that all of the species on the forest could be expected to remain viable over the 100-year planning horizon. Only after that did it look to see what was left, what was not in that mosaic, and assign development, as it calls them. Well, let me assume that everything you've just said was correct. If the Forest Service at that point thought demand was twice what the actual demand was, then would it follow that the Forest Service may have contracted for more timber to be cut than they would have permitted otherwise? No contracts are affected by this plan. This plan is a prospective guidance that planners of eventual projects to cut timber must. Don't the projects have to be consistent with this plan? They absolutely have to be consistent with this plan. And this plan sets out the limits, namely where cutting must be prohibited, where lands must be treated in certain ways in order to maintain habitat, and so on. The standards and guidelines and the set-asides and all of that are in this plan. Let me see if I get this straight. You've got the plan, and it basically says these lands are available for cutting, but these can't be in broad terms, or no? That is essentially correct, but I would put it the other way. These lands may not be used for any development use, and what is not in this group of lands we will consider the possibility of development on. And then when the Forest Service looks at a specific site for purposes of letting a contract, it can't have a contract on the first group of lands. Correct. But in determining how many contracts it lets, is that when the TTNF or RF or RA, whatever, the Tongass Forest Act kicks in? Yes. I think it's fair to say that the TTRA obligation comes primarily at the project stage, when the Forest Service is determining what contracts are appropriate. There is no obligation in that statute. Are there projects here that are challenged under that? Under whether or not they appropriately seek to meet demand? Right. I don't believe so, Your Honor. Seeking to meet is a tricky kind of requirement in the statute, and it doesn't because all of the other obligations precede that seek-to-meet requirement, there really isn't a way, I think, that it could be enforced, unless the Forest Service were to close the forest to logging altogether. Well, then the other question comes, I mean, I understood your kind of schematic for how this works. And so I have two questions. One, I have places in your brief I want to know where the support is for those statements, and I'll come back to those. But the NRDC lists a series of citations in connection with the forest plan that make reference to these projections, having to do with market projections and the fallout of those, which is, you know, jobs and people and that sort of thing. So it's hard to understand how you can say that the market projections don't figure in to the forest plan and segregating these lands when the forest plan and the various appendices have these references. So how do you reconcile that? It's easy to reconcile that, Your Honor. The forest plan reveals all of the impacts, and not necessarily in order to balance anything against anything else. So it is required to show what the impacts will be, and the Forest Service did make errors that are shown on the errata sheet in displaying some of the economic impacts. If one were to correctly interpret the Brooks and Haynes report, some of those numbers would have been different. Throughout the planning process, it used other earlier projections that it did not misinterpret and that were essentially equivalent to what its misinterpreted number was. So no one was, excuse me. Equivalent to the misinterpreted number? Yes. The new projection suggested that there might be a 50 percent drop in local market demand, and therefore, by misunderstanding that, the forest supervisor essentially understood it to mean that the change would not be very significant. The change, however, was more significant than that, and that is why in Appendix M, the Forest Service also reviewed that change to see whether it warranted additional consideration under NEPA, and concluded that because alternatives are not selected on the basis of market demand, and because these kinds of projections are for very short term, whereas the plan is for 100 years. Okay, there's one. It says in your brief, the Forest Service, referencing Appendix M, concluded that because the projections of market demand for timber were not significant to its choice and were based on unreliable assumptions, no supplemental EIS was required. Where does it say that in Appendix M? Because that's the statement that kind of appears throughout your brief that doesn't have any record citation to it, and then it goes on to say the agency determined, this is at page 28 of your brief, that the draft Brooks and Haynes projections were based on unreliable assumptions and were not significant to its choice of alternatives to the plan. May I get you an excerpt of the record citation to that page? What you can do afterwards is provide it to the clerk, because we don't – I don't know if that's true or not. I looked, but, you know, we've got hundreds of pages here, and I looked and looked, but then I also – I have the page number in front of me. NRDC carefully pointed out a lot of places where those projections are incorporated. It carefully identified those places, but it did not do so in context, I might say, Your Honor. In any number of places where it suggests that the Forest Supervisor was balancing those numbers against others, in fact, those come in as a last explanation of how this plan meets all of the Forest Service's obligations. In other words, it says, and on top of all these other reasons why this is a good plan, it will provide sufficient timber to meet demand under the TTRA. Or what the real rationale was for considering only those alternatives that would include some timber and not any alternatives that would not, was that the plan needed to provide the support necessary for a viable timber industry. That is what the plan set as a baseline. And I think it is fair to say that the TTRA suggests that that's an appropriate baseline if it doesn't require it. In other words, what the Forest Service needed to do was to consider those alternatives that would provide for a viable timber industry and see whether any of those alternatives could be implemented in a manner that would meet all of the other requirements, including wildlife viability. And that is what it did. The ‑‑ So you're saying that the statutory requirements of the TTRA are not part of the balancing that goes into the development of the obligations under the Forest plan. Far from it, Your Honor. The TTRA on its face requires compliance with the National Forest Management Act and all the other environmental statutes. And as a prerequisite, and then says, subject to all of that, that the Forest Service shall seek to meet market demand. The record clearly shows that what the Forest Service was attempting to do was to find the appropriate balance by first meeting all of the demands and then looking to determine how much land would be left to consider for timber. For example, it explained, and this is in the excerpts of record at 286, that if any alternatives resulted in a suitable timber land base that was insufficient to operate a viable commercial timber program, then the effects were considered essentially the same as no logging because no commercial program means no logging. If there's no one there to log it, it doesn't get logged. So to the extent that the ability to produce timber was balanced, it was at that level. But it never ‑‑ no alternative was altered to permit more logging. Logging was not discussed in any of the comparison of alternatives except to describe what logging could occur after all of the other obligations had been met. And the Forest Service also, on this record, clearly did make an effort to provide for all of the special kinds of interests that the Tongass provides. For example, the roadless areas that the plaintiffs were so concerned about in this case are treated carefully. For example, 17 special roadless areas that came up in a lot of comments were protected as the record of decision explains, excerpts of record 296. And each of those was put into protective zoning on the forest. It's also important to note that of the lands that were open to consideration for logging, the EIS suggests that approximately 57 percent will not be logged because of the protective measures that are placed over the top of the decision about where logging can occur. Those are the standards and guidelines that require riparian areas to be ‑‑ that require various wildlife considerations. Your time has expired, including the time of your colleague, but we will give you two minutes to enlighten us as to your position. Thank you, Your Honor. My name is Steve Silver. I represent the intervenors, Alaska Forest Association and the state of Alaska, and I appreciate the court's indulgence. We have just one simple message. This case for us is about survival, survival of our small industry, survival of the small remaining timber mills. There are only three, all privately owned, all owned by local people, a road building company, and what will happen to them if we're unsuccessful in this case. Our plea to this court is if the court cannot find for the government, which we totally support, we support all of their positions, and my limited time will not go into those, we urge this court to remand the case back to the trial court with full flexibility for the trial court to fashion a remedy that will permit survival of our industry consistent with the findings of the court. We think this case is much like Forenzo Clearwater, where this court found a violation of NEPA, but found a cure in later adopted decisions. The later adopted decisions here are the site-specific EISs that follow this programmatic EIS, and we also commend to the court our submitted declaration from Judge Vonderheide in 1987. We're in the same position as we were in 1987. By use of litigation, the core plaintiffs, SEAC, Wilderness Society, and Sierra Club, are effectively managing the Tongass Forest, as Judge Vonderheide referred to them, acting as the Timbers are. There's adequate flexibility in the new planning regs. We think to the court. They're not managing anything that's not permitted or sanctioned by law, are they? We appreciate that, Your Honor, but we, as I say, we submitted that to the court as a matter of record and urge your attention to that, and thank you for the indulgence of the time. All right. If we reach the remedy, I think we have your point. Do you have a question, Judge Kuhl? I have a question as to whether there's been any, and it may be totally impossible given the nature of the issues, but has there been any mediation in this case with the Ninth Circuit's processes, the government, the environmental groups, and the industry? We engaged in mediation but found that we could not reach a solution, and I think the mediator filed a report to that effect. Thank you. Thank you. You've overstayed your time but not your welcome, so we'll give you another minute. Thank you very much. Just a couple quick things. I wanted to respond to the statement by counsel for the government that they took, it was abundantly clear that they did everything to ensure wildlife. That is misleading. There was never 100 percent insurance of ensuring viable populations of wildlife. To the contrary, the decision explicitly acknowledges the risk that wildlife faces even under this decision. I would refer you to page 20 of NRDC's opening brief, which has a chart that shows the likelihood of ensuring well-distributed viable populations for a variety of species. What it shows is that there is a significant degree of risk. The regional forester acknowledged this and talked about this and made his decision in a multiple-use context, and he talks about that in the same sentence that he's talking about, determining how much risk to allow for wildlife in the rod. And those citations are on page 21 of our brief, and I would refer you to those. Let me just clarify one point. Is it your position that the Forest Service shouldn't be looking at this in a multiple-use context overall? Well, under the viability regulation, that's the interpretation that this court has adopted in the Seattle Audubon Society v. Mosley decision. In that case, the Forest Service had concluded that their plan would result in an 80 percent likelihood of ensuring viable populations, and this court said that was okay, because if they tried for a higher assurance of that, that it would preclude any multiple-use compromise. Right. I mean, my understanding was that that, of course, distinguishes forests from other lands, is this multiple-use premise that underlies the forest system. So you're not suggesting that shouldn't be driving them in some sense, are you? Oh, yeah. It's absolutely proper for them to take that multiple use into account. You can use that where you have the, if it's going to preclude multiple-use compromises, you have to take a degree of risk with wildlife. And this is about what was the appropriate degree of risk, how much did they need to take, and what you see is that this error that they made about market demand caused them to way overweight that side of the equation, that multiple-use factor in their decision on wildlife. Your opponent says they didn't consider that at all. They figured out what had to be set aside first to meet all of the requirements of wildlife and everything else, and then they're dealing only with the balance, which all could be logged on this hundred-year yield basis. Well, the record shows that they did do this balancing. You can see that. That's part of what I was referring to you at page 21 of our brief. There was not just this open and cut, okay, how much do we need to do to ensure wildlife? Okay, that's it. That ends the question. There was the sustainability thing I was talking about. How much risk are you going to take? How are you going to strike that balance? That was the question that the regional forester was struggling with. And you do get this balance. But weren't they balancing that against this overall AQ, whatever that factor is, as opposed to market demand? Well, the market demand was a specifically cited factor. That's that citation at, I think, page 15 of the record of decision, where it says, we're trying to preserve a flexible timber sale program as reflected in the most recent market demand study. And then he goes on to say, well, some of them have more timber than we need. Some have less than we need. And this one is the right amount, and it got an acceptable level of risk for wildlife. And acceptable was the word they used. What made that acceptable? Well, in his view, it was that need to meet those timber demands. But it was wrong. Thank you. I think we have your point in mind. Do you have another question? I have one quick question. You know, if we go for the government and industry position, they win completely. If we go for you, your side wins. But if we determine on the law that the appellant's position should prevail and that the record of decision is arbitrary and capricious, how do you address Mr. Silver's remedy point where he says that he doesn't, you know, he's advocating the other side, but if we decide that, then he asks us to remand it to the district court with some sort of sensitive keep industry alive remedy in mind. Well, I don't think it would be appropriate to do that here. We haven't had a chance to litigate relief in this case. We never put on our case. We haven't put on our evidence. We haven't had a chance to do any discovery. We haven't had any hearings. We never reached the relief phase of the case in the district court. I think that Judge Singleton and the district court is perfectly well able to address the concerns of the industry without more specific direction from this court. But, moreover, I don't want to walk away from here conveying any impression that we are attacking the survival of the industry the way that Mr. Silver put it. There's adequate, abundant opportunity for this industry to survive and, indeed, to thrive without threatening all these roadless areas. There's just way more land open for logging than there needs to be. But let me ask one question that's a practical matter. I mean, if we were to rule in your favor and say, well, it looks like this did permeate the decision in some aspect, and in their mind it didn't, isn't the likely result that they're going to go back and they're going to say, we've looked at this again, it didn't affect us the first time, but we are looking at it again because we've been told to and it doesn't affect us the second time, and we're kind of right back where we started? I'm sorry. I mean, they're not the decision won't change because... Oh, the Forest Service's decision when they are reevaluating the forest plan? Right. Well, it's going to, I mean, they're going to have to go through a new process. They're going to have to do a new EIS. They're going to have to take another look at market demand, and one thing we know for sure now is that... If they say, look, we didn't look at it before and we're definitely not going to look at it now, you would then say they have to look at it? Well, I guess I will evaluate... Legally. We would have to evaluate that decision on the merits. I mean, one thing we know now, for example, is there are new forest planning rigs that have recently been adopted, and so we're going to see a new kind of process with a new kind of plan. It's a little hard to predict exactly what it's going to look like, but one thing we know is the Forest Service is going to have to make a decision that they can defend on the record and on the facts, and the current plan doesn't meet that standard. Thank you. The case just argued, the NRDC versus the Forest Service is submitted. I want to thank all counsel for argument, and also particularly thank you all for providing us with information.
judges: B. Fletcher, McKeown, Gould